FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA AND THE COMMONWELATH OF VIRGINIA, *EX. REL.* [UNDER SEAL], | ) ) ) ) |
| *v.* | ) ) ) |
| [UNDER SEAL] | ) ) ) |
| *DEFENDANT.* | ) ) ) ) |

Case No. 1:19CV593

**COMPLAINT FOR
VIOLATIONS OF THE
FALSE CLAIMS ACT
31 U.S.C. §§ 3729 *et seq.*, AND
THE VIRGINIA FRAUD
AGAINST TAXPAYERS ACT,
Va. Code § 8.01-216.3 *et seq.*)**

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA AND THE STATE OF VIRGINIA,** *ex rel.* ) ) ) | Case No. _____ |
| **NATHAN DAVIDHEISER,** ) ) | **CIVIL COMPLAINT FOR VIOLATIONS OF THE** |
| *Plaintiff,* ) ) | **FALSE CLAIMS ACT, 31 U.S.C. §§ 3729,** *et seq.* **AND THE** |
| *v.* ) ) | **VIRGINIA FRAUD AGAINST TAXPAYERS ACT, Va. Code** |
| **CAPITAL RAIL CONSTRUCTORS,** ) ) | **§ 8.01-216.3,** *et seq.* |
| **196 Van Buren Street, Suite 200 Herndon, VA 20170,** ) ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| *Defendant.* ) ) | **JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.  Qui tam relator Nathan Davidheiser ("Davidheiser" or "Relator"), by his attorneys, on behalf of the United States of America and the State of Virginia, files this complaint against Defendant Capital Rail Constructors to recover damages, penalties, a reasonable Relator's Share, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3 ("VAFTA") committed by the Defendant.

2.  In May 2013, Capital Rail Constructors ("Capital Rail") contracted with the Washington Metropolitan Airports Authority ("MWAA") to build Phase II of the Metrorail Silver Line project ("Dulles Project"). This phase of the project will extend the Silver Line metro to Dulles Airport and the surrounding area.

3.     The value of the contract is $1,777,777,000 and is funded through a mix of funds from the federal government, Loudon and Fairfax Counties, VA

4.     The MWAA is providing the majority of the funding for this project and is overseeing its construction.

5.     The Washington Metropolitan Airports Authority ("MWAA") is providing the majority of the funding for this project and is overseeing its construction.

6.     Defendant is violating the False Claims Act in at least two ways. First, Defendant is intentionally producing and shipping concrete that does not meet contract specifications for, among other things, air entrainment and viscosity and are using unapproved stone. Each of these failures by Defendant will result in significant degradation to the Dulles Project.

7.     Second, Defendant is either not performing the required quality assurance tests or, in cases where the tests are actually performed, are falsifying test data in an effort to hide the fact that their concrete is deficient. Defendant is then providing these false records to the government to support its claims for payment.

8.     Defendant's fraudulent conduct is ongoing.

### Jurisdiction and Venue

9.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 31 U.S.C. § 3732. Davidheiser's federal cause of action for retaliatory discharge is authorized by the False Claims Act, 31 U.S.C. § 3730(h).

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because Defendant Capital Rail transacts business within this judicial district and committed the false and fraudulent acts alleged in this complaint within this judicial District.

**Parties**

11.     Relator Nathan Davidheiser is a citizen of the United States and resident of Pennsylvania.

12.     Davidheiser graduated from Mansfield University in May 2013 with degrees in Biology and Fisheries Management.

13.     Prior to joining Universal Concrete Products Corporation, ("UCP"), Davidheiser worked in the gas industry and as a purchasing manager for Stony Run Masonry Supply.

14.     Davidheiser was an employee of UCP from July 2015 until February 2016 as a lab technician in UCP's quality control division.

15.     Among other duties, Davidheiser was assigned to work on the Dulles Project and was responsible for testing concrete before it was poured into pre-cast molds and ensuring that it met contract specifications.

16.     Capital Rail Constructors is a joint venture of Clark Construction Group, LLC ("Clark"), and Kiewit Infrastructure South Co. ("Kiewit") that was formed for the purpose of bidding on the Dulles Project.

17.     UCP is a subcontractor to Capital Rail on the Dulles Project and is headquartered in Stowe, Pennsylvania and specializes in the manufacturing of pre-cast concrete.

4

## Factual Allegations

### I.  About Defendant

18.  Founded in 2013 in order to bid on the Dulles Project, Capital Rail is a Joint Venture of Clark Construction Group, LLC and Kiewit Infrastructure South Company.

19.  Capital Rail contracted with the MWAA to build the Dulles Metrorail Project Silver Line Phase 2.

20.  Capital Rail subcontracted with UCP to produce pre-cast concrete for the Dulles project, and UCP began supplying pre-cast concrete for the Dulles project in or around August 2015.

### II.  About the Dulles Corridor Metrorail Project

21.  The Dulles Corridor Metrorail Project ("The Dulles Project") consists of a 23 mile extension that branches off the existing DC Metrorail System orange line after the East Falls Church metro station.

22.  The Dulles Project is being built in two phases.  Phase I of the project opened on July 2014.

23.  Preliminary construction of Phase 2 began in 2014.

24.  Phase 2 will extend the Silver Line metro from Reston to Washington Dulles International Airport and to Ashburn in Loudoun County.

### III.  The Contract Incorporates PCI Specification Requirements

25.  On February 6, 2013 MWAA issued an amendment to its request for proposals (the "Amendment," http://www.mwaa.com/sites/default/files/archive/mwaa.com/file/8-13-C001-RFP_Amend4.pdf). Capital Rail submitted its bid acknowledging the Amendment.

26.    Section 03450 of the Amendment requires that pre-cast contractors comply with Precast Concrete Institute ("PCI") Manual 116 and PCI Manual 117. PCI Manuals 116 and 117 define the technical specifications that govern the manufacturing of pre-cast concrete slabs, and §4.2.1 of PCI Manual 116 and the Contract require concrete with air content at 6% (+ −1.5%).

**Table 4.2.1.   Total Air Content for Normal Weight Concrete**

| Nominal maximum size of aggregate, in. (mm) | Total air content, percent, by volume [1] | |
| --- | --- | --- |
| | Severe Exposure | Moderate Exposure |
| Less than 3/8 (9) | 9 | 7 |
| 3/8 (9) | 7-1/2 | 6 |
| 1/2 (13) | 7 | 5-1/2 |
| 3/4 (19) | 6 | 5 |
| 1 (25) | 6 | 5 |
| 1-1/2 (38) | 5-1/2 | 4-1/2 |

1. Air content tolerance is ± 1/2 percent.

27.    This 6% requirement is also reflected in the concrete mix design documents:



6

## IV.     Proper Testing Procedures

28.     Precast concrete is concrete that is produced by casting concrete in a reusable form or mold which is then cured in a controlled environment, transported to the construction site and lifted into place.

29.     The process for manufacturing a pre-cast slab begins with Bill Hydock, a manager at UCP, preparing a document called a "mix design" document.

30.     This mix design identifies all of the technical specifications that a concrete must meet, including, among other things, the air content (or air entrainment) and "slump."

31.     Air content is the percentage of air voids within a particular batch of concrete.

32.     Concrete with the appropriate level of air content is able to expand and contract during freezes and thaws.

33.     If the air content is too low, the concrete will not be able to expand and contract with temperature changes.

34.     When a slab of concrete is unable to expand and contract with temperature changes, it is more likely that the structure will crack.

35.     Cracks in concrete reduce overall structural integrity allowing penetration of water that will reach the rebar causing oxidation of the rebar.

36.     "Slump" measures the viscosity of a batch of concrete.

37.     To test slump, testers fill a cone with concrete and then lift the cone off of the concrete.

38.     As the form around the concrete is removed, the concrete will drop as it lacks the support to remain completely erect.

7

39.     The tester then measures the change in height of the concrete and this number is referred to as the "slump."

40.     Concrete with a high slump number means that there is either too much water or admixtures present, resulting in weak, brittle concrete.  As identified in the "mix design," slump is to be 5 inches.

41.     Before large-scale production commences, UCP provides to its customer a sample of the resulting concrete batch.

42.     UCP does not test this sample prior to shipping it to the customer.

43.     The customer will examine the color and texture of the concrete sample and either approve or deny the mix.

44.     If approved, UCP will then work from that mix design when it ramps up to large-scale manufacturing.

45.     If denied, UCP will introduce a number of different aggregates in order to meet the previously identified air entrainment and slump requirements.

46.     In layman's terms, admixtures are chemical additives used when making concrete to get it to the right specifications and properties on a mix design.

47.     Once the sample has been approved, UCP's engineers have a set of design specifications from which to work that should, theoretically, result in concrete that meets specifications.

48.     When concrete is being mixed and the admixtures are being introduced, UCP takes a small representative sample to its quality control labs for testing.

49.     This additional quality control testing is necessary primarily because of deviations in the environment in which the concrete is being produced.

8

50.     As temperatures fluctuate and weather changes, the resulting concrete may have different qualities or characteristics even if the same mix-design is followed.

51.     Davidheiser was a technician in the quality control lab and performed much of the quality control testing relating to air entrainment and slump.

52.     The purpose of this testing was to ensure that concrete met specification.

53.     If the concrete does not meet specification, that batch of concrete should be discarded and a new batch created and tested.

## V.     UCP Knowingly Produced and Delivered Concrete that does not Meet Specifications

54.     UCP provided deficient concrete in two ways.  First, its concrete failed to meet contract specifications relating to air entrainment and slump.  Second, the stone used as the aggregate was from an unapproved quarry that failed to meet other industry standard testing requirements, including alkali–silica reaction ("ASR") testing.

55.     PCI manuals 116 and 117 are incorporated by reference into the Contract and specify that the air content for precast concrete should be tested periodically during daily operations.

56.     Davidheiser was responsible for quality control testing the representative samples for each batch of concrete used by UCP in its pre-cast slabs.

57.     When Davidheiser rejected a representative sample as failing to meet requirements, that rejection should have led to UCP's engineers discarding that batch of concrete and beginning anew.

58.     Instead, when Davidheiser discovered that a particular batch failed to meet specifications, Nolan instructed Davidheiser to "bump the next batch up an ounce," referring to the admixtures used to make the concrete.

9

59.     Nolan further instructed Davidheiser to let the engineers pour - and, ultimately, put to use on the Dulles Project - the non-conforming batch of concrete regardless of the failed test results.

60.     Davidheiser received instructions from Nolan and project manager Dave Kuzowa to record false test data that would mask the deficiencies in UCP's concrete.

61.     By November 21, 2015, Davidheiser had completed coursework in concrete testing and more fully understood the ramifications of employing deficient concrete on the Dulles Project.

62.     Davidheiser began keeping accurate records of instances in which the concrete failed to meet the required 4.5% to 7% air entrainment requirement.

    a.   On November 11, the air content was as low as 3.8%.

Date: 11/11/15   Technician: NLD

**Property Test**

| Test # | Job | Deck | Time | Air | Slump | Temp. | Amb. Temp. | Unit Wt |
|--------|-----|------|------|-----|-------|-------|------------|---------|
| F-1 | 821 | 17,6,A | 10:30 | 3.8% | 7.5 | 62° | 65° | 149.6 |
| F-2 | 838 | 15,7,8,10 | 1:40 | 3.2% | 22.75" | 70 | 65° | 150.7 |
| T-1 | 838/854 | 5,7,8,14,10,10 | 4:00 | 4.2% | 8.75 | 73° | 64° | 149.4 |
| F-3 | 834 | 5,16 | 4:20 | 4.0% | 7" | 66° | 63° | 147.8 |

    b.   On November 12, 2015, the air content dropped to 2.9%.

Date: 11/12/15   Technician: NLD

**Property Test**

| Test # | Job | Deck | Time | Air | Slump | Temp. | Amb. Temp. | Unit Wt |
|--------|-----|------|------|-----|-------|-------|------------|---------|
| F-1 | 821 | 6 | 11:15 | 2.9% | 8.75" | 60 | 59° | 149.8 |
| F-2 | 834 | 5 | 1:17 | 4.9 | 7" | 66 | 60° | 146.7 |
| F-3 | 838 | 7,8,10 16 | 3:20 | 2.5% | 23.5 | 73° | 67° | 149.8 |
| T-1 | 828/838 | 13,14,7,8,10,15 | 4:00 | 2.3% | 8.5" | 74 | 65 | 147.6 |
| F-4 | 828 | | | | | | | |

    c.  On November 19, 2015 the air content is 4.1%.



63.    Despite the fact that none of these batches met contract specification, UCP incorporated all of them into pre-cast slabs that were put to use on the Dulles Project.

64.    These same test records also establish that, on numerous occasions, the "slump" for the concrete far exceeded that which was specified in the mix design documents.

## VI.    UCP Sourced Stone from an Unapproved Quarry that Cannot Meet Industry Standard Testing

65.    All concrete is subject to an alkali-silica reaction ("ASR"). This reaction is a byproduct of the interactions among the various materials found within concrete and is present to some degree in all concrete. This reaction will inevitably result in some degradation and cracking of the concrete.

66.    One way to mitigate the effects of ASR is to test the aggregate to ensure that it is less susceptible to the effects of ASR as various types of stone will react differently within the concrete

67.    When UCP entered into its contract with Capital Rail, it did so by stating that it was going to source its stone from a quarry operated by Eastern Stone in Oley, Pennsylvania.

68.     In late December 2015, Davidheiser received an e-mail from Martin Limestone, a quarry in Denver, Pennsylvania, stating that the aggregate did not pass the ASR test and that it was to be considered as "potentially deleterious" or words to that effect.

69.     In early January 2016, Davidheiser took this e-mail to Hydock and Marc Davis, Vice President, who were clearly panicked that Davidheiser had uncovered this problem.

70.     Hydock told Davidheiser that the company "is not even supposed to be using that aggregate [from Martin Limestone]. It's not in the contract for Dulles," or words to that effect.

71.     Hydock went on to explain that UCP was supposed to be using aggregate from a quarry operated by Eastern Stone in Oley, Pennsylvania but that the quarry had closed down two years ago.

72.     Davidheiser pressed the issue, asking why UCP could not source stone that was within specification for ASR.

73.     Hydock replied that there is "No local quarry with stone that fits the petrographic analysis in the contract," or words to that effect.

## VII.    The Combined Effects of the Non-Compliant Concrete and the Improperly Sourced Stone Could be Catastrophic

74.     Defendant's failure to utilize appropriate aggregate coupled with the deficiencies associated with the concrete's air entrainment and slump is a confluence of problems that will lead to significant degradation if utilized on the Dulles Project.

75.     During a freeze and thaw cycle, the concrete will need to expand and contract.

76.     This will necessarily result in the scaling of the concrete and, given these deficiencies, cracks will form that will allow water to penetrate the concrete.

77.     Once this happens, the ASR will occur more rapidly, ultimately resulting in exposure of the rebar (reinforcement) to oxidation and the compromising of structural integrity.

## VIII.   Nolan Instructed Davidheiser to Generate and Submit False Testing Data

78.     While Davidheiser was employed at UCP, Nolan instructed him and one of his co-workers at the concrete plant, George Gill, to input false data into its books.

79.     By November 2015, UCP had completed nearly all of its first delivery under the contract.

80.     On or about November 19, 2015, PCI inspectors came on site to perform an audit of UCP's facility.

81.     In anticipation of this audit, UCP, through Nolan, began a rushed campaign to get the out-of-specification concrete up to specification.

82.     During the audit, PCI concluded that UCP's quality control testing was deficient in some areas and identified numerous batches of concrete as being noncompliant with PCI standards.

83.     Following the audit, Kuzowa, project manager, told Davidheiser that "If you have concrete out of spec in that data book, you need to change it before you submit it to Dulles or they'll reject it."

84.     Concerned by these instructions, Davidheiser texted Nolan who was on vacation in Florida at the time.

85.     In this text message, Davidheiser informed Nolan that the "air [entrainment] is below 2% or more," well outside of the contract specifications.

86.     Nolan responded in the text by stating, "We cannot give them [customers of the Dulles project] sheets with any testing data out of specs. They will reject those panels. We have to change the data."

87.     Nolan then instructed Davidheiser on what he should say if confronted by anyone regarding the seemingly deficient quality control reports.



88.     Following this exchange, Davidheiser did as instructed and fabricated testing data to make it appear as though UCP's concrete was within specification.  Kuzowa then sent this data to the customer.

## IX.    Nolan Instructed George Gill to Falsify Testing Data

89.     Nolan also instructed one of Davidheiser's co-workers, George Gill, to falsify test data.

90.     Nolan routinely provided Gill with an empty book to log testing data and instructed him to enter into the books results for tests that Gill had not performed and about which Gill had no knowledge.

91.     When Gill questioned Nolan about how he should log test results for tests that he had never performed, Nolan told Gill, "Make something up, and make sure it's a good number," or words to that effect.

92.     By "good number," Nolan meant for Gill to fabricate test results which fell within the bounds required by the contract.

93.     In or about mid-September, Nolan instructed Gill to "do the books" for a series of tests that had not been performed.

94.     Nolan explained to Gill that there was an upcoming inspection and that the books needed to be complete.

95.     Nolan instructed Gill to take the books home and enter testing data for these tests that were never performed or for which data was lost.

96.     Gill protested to Nolan and mentioned that it was illegal for UCP to record false test data.

97.     Nolan responded by stating, "By the time this is built, the concrete will be hardened enough for construction purposes," or words to that effect.

98.     Gill complied with Nolan's instructions to take the books home and falsify test results.

99.     Upon returning to work, Gill shared his concerns with company Vice President Marc Davis.

100.    The very next day, UCP demoted Gill, took him out of quality control, and forced him to work the night shift.

101.    When Gill questioned why he was demoted, Davis told Gill that Gill was "not a good fit" for quality assurance.

102.   On various occasions, Davidheiser protested UCP's testing protocols and the instructions that he was receiving to falsify test data.

103.   After repeated attempts to get his supervisory chain to adhere to the correct testing protocols, Davidheiser began to ignore the instructions to enter false numbers into UCP's records, and instead began to enter the actual testing results.

104.   On February 17, 2016, Davidheiser sent an e-mail to Marc Davis, Vice President of UCP, complaining about the falsification of testing records, and stating that he did not want to break any cylinders (i.e., perform strength testing on the concrete) because he was not qualified to do so.

105.   Davis did not reply to Davidheiser's concerns regarding the falsification of records and instead focused on explaining to Davidheiser that he was qualified to perform strength testing.

From: Nathan Davidheiser [mailto:davidheisernl03@aol.com]
Sent: Wednesday, February 17, 2016 9:48 AM
To: Marc Davis <mdavis@UniversalConcrete.com>
Subject: PCI non compliences

Mark,

I am writing to express my concern for the company's integrity and safety of both its clients and employees. Test such as gradations and overnight concrete temp graphs are being deliberately forged. Cylinders for the 821 job are being intentionally mislabeled in order to make up for days missed. Break data has been made up in the past if cylinders are missing. Concrete is being poured out of specification. I am being asked to constantly falsify data that we send out to our clients in order to appear that the concrete is in specification. We are missing many aggregate certifications and test results.

I am concerned that these actions will continue, and has seem to be the norm in the QC department for years. Issues such as the confusion for the Martin #8 being deemed deleterious, and not using the approved aggregate for the 821 job could have been avoided by following proper QC procedures. The 828 job has had many issues with air that is only being resolved now that I am more experienced with admixtures. These issues have been brought up numerous times and are not being addressed.

I feel that I am over burdened with work, and am frustrated when I see Andrew on the phone while we are behind on work. It is even more frustrating when I am working non stop, he is on his phone, a test is not done in time for production, and I get blamed for holding back production. Cylinders are not being broken by the 28 day mark. Documents are being falsified for both the audit and for our customers. I feel that these issues are an easy fix, and will take minimum effort to regain proper protocols.

I do not feel comfortable doing things that are fraudulent. I will no longer comply with changing numbers if asked. I will also not be breaking any cylinders until ACI certified. Nate, take a look at PCI MNL-117-13 Chapter 1 sub-section 1.3.1 second paragraph down on page 1.4 & Chapter 6 sub-section 6.2.1 fourth paragraph down on page 6.3 and carries over to page 6.4. I am more than willing to receive my certification and also prep the cylinders for breaking. My intentions are for the best of company and its customers, and the safety of our employees. Please handle this will care, as I fear retaliation for co-workers. Thank you for your time and consideration.

Nathan Davidheiser

106.   The next day, Davidheiser refused to continue breaking cylinders.

107.   Plant Manager Brian Bretzius sent Davidheiser home, and at this point Davidheiser believed he had been terminated.

16

108.    On February 22, 2016, Davidheiser followed up with another e-mail to Davis

again complaining about UCP's failure to adhere to the contract requirements.

> From: Nathan Davidheiser [mailto:davidheiserml03@aol.com]
> Sent: Monday, February 22, 2016 7:59 AM
> To: Marc Davis <mdavis@UniversalConcrete.com>
> Subject: Re: PCI non compliances
>
> Marc,
>
> After speaking with the director of education at PCI , I have confirmed that PCI references that Astm C 1077 must be followed in response to specific in-house test. This statement 100% contradicts Chapter 6 Section 6.2 Testing and subsection 6.2.1 second paragraph where ASTM C1077 is mentioned when a specification for a job or a plant elects to use or is required to use an outside independent and accredited laboratory. This is however not in the audit or enforced at the moment. There isn't a precast company in the Atlantic Region that is accredited and certified under ASTM C1077. They are working on revising their auditing program after Dulles metro rail complained. Further more, NY code require that astm c 39 which is done in-house at a precast plant must be broken by certified personnel. After reviewing ASTM C39 refers to minimum standard for ACI level 1 certification which you have. We are accredited with PCI and we aren't doing nothing any different than any other PCI certified plant in the Atlantic region is doing. This affects the data for Marist as well as previous jobs located in New York. PCI requires quality control personnel to have ACI Grade 1 certification to conduct these test unless a specific project specification requires something other. You are certified.
>
> After having 3 panels fall in the last four months, I simply do not feel comfortable being the one responsible for so many lives while uncertified. You were specifically the root cause for the first incident due to you skipping PCI guidelines and requirements along with our own QSM Manual for which you openly admitted to and thus placed on 90 day probation. What would that certificate have done to change your personal decision to skip the cylinder breaks and rebound hammer test? I also do not feel comfortable relying on a rebound hammer that is lacking calibration curves needed by PCI standards. I'm looking into these claims. With concrete being poured at temps as low as 37 degrees and air as high as 11%, I'm looking into these claims. I am extremely concerned about client and employee safety, and will not be held accountable.
>
> After my abrupt, unprofessional, and wrongful termination on Friday, I am writing you with concern about the safety and liability for the company and it's employees. I hope that these issues are taken seriously and addressed before someone gets hurt. I was aware of the issue last Friday and received emails from both Andrew and Brian on what took place. This morning I followed up and spoke to Brian and Dan inquiring about this email and to make sure you were at work today. My understanding is that you were simply sent home for refusing to do your work and break cylinders and that you became argumentative (something I brought up in your recent 6 month review) with management personnel and our President too. You were asked to clock out and go home for the day. Nobody here terminated your employment. I wish you and the company the best. If you have any questions on current PCI non-conformances and falsified data I will be happy to help.
>
> Just to clarify based on this email and statements made in the last paragraph have you quit and have no intentions of returning to work?
>
> Nathan davidheiser

109.    Davidheiser's February 22, 2016 email reiterated his belief that UCP wrongfully

terminated him the previous Friday.

110.    On February 23, 2016, Davidheiser emailed Davis and stated that he was "not

quitting" and did not "have any intention of quitting." Davidheiser further stated that from that

moment he would be "refusing to do anything [he] believe[d] is illegal." He also explained that

he was "more than willing to return to work and complete [his] duties that [he was] certified to

do," but elaborated that his "interpretation of [Davis's] email . . . giv[es] [Davidheiser] the

ultimatum to either break cylinders or be terminated."

111.    On March 21, 2016, Davidheiser filed a qui tam action in the United States

District Court for the Eastern District of Virginia captioned *United States ex rel. Davidheiser v.*

*Universal Concrete Products Corp., et al.*, 1:16-cv-316, listing UCP and Capital Rail as

17

Defendants pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").

112. Davidheiser subsequently filed an Amended Complaint on March 29, 2016, and on May 21, 2018, Capital Rail was dismissed without prejudice before any opposing party had been served and before any opposing party had served either an answer or a motion for summary judgment.

113. The United States and Commonwealth of Virginia ("the Government") intervened in the Civil Action on May 10, 2018, and filed a Consolidated Complaint in Intervention of the United States and Commonwealth of Virginia on July 9, 2018, and filed an Amended Consolidated Complaint in Intervention on August 9, 2018.

114. Davidheiser filed a Second Amended Complaint on December 13, 2018, listing UCP, Donald Faust, and Andrew Nolan as defendants.

115. Nolan pleaded guilty to conspiracy to commit wire fraud in *United States v. Nolan*, No. 1:18-cr-292 (E.D. Va.), and thereafter the Government, UCP and Faust entered into a settlement agreement wherein they agreed to pay to the Government as follows: $150,000.00 by Faust and $850,000.00 by UCP.

116. Capital Rail agreed as an alternate remedy conferring economic benefit on the Government to pay for the sealant to be applied to the panels and has set up an escrow account to pay for the reapplication needed every ten years once the project is complete. Capital Rail has demanded indemnification and contribution from UCP in the amount of $19,000,000.00, including $1,000,000.00 attributable to attorney's fees and $18,000,000.00 in anticipated remedial efforts and expenses (including $6,700,000.00 for Capital Rail's sinking fund/hard costs). The total cost and value of the remediation will be between $5,000,000.00 and

$18,000,000.00, and the Government are direct beneficiaries of this alternate remedy agreement entered into with and secured from Capital Rail, which conferred a substantial economic benefit on the Government.

117.    Davidheiser was the catalyst and but-for cause of Capital Rail's agreement to provide an alternate remedy conferring a substantial economic benefit on the Government and thus is entitled to a Relator's Share.

**Count I**
**Violation of the False Claims Act,**
**31 U.S.C. § 3729(a)(1)(A)**

118.    Davidheiser incorporates herein by reference and re-alleges the allegations stated in the foregoing paragraphs.

119.    Defendant knowingly presented or caused to be presented to the United States, false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval under the federally-funded procurement contracts in violation of 31 U.S.C. § 3729(a)(1)(A).

120.    The concrete that Defendant provided to the government fails to meet the specifications required under the Contract.

121.    Defendant knowingly presented or caused to be presented claims to obtain payment for deficient concrete to the federal government.

122.    Defendant presented or caused to be presented fraudulent claims by billing for deficient concrete.

123.    Under its contract with MWAA, Capital Rail is required to inspect the work of its subcontractors, including UCP.

124.   Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Davidheiser need only allege sufficient indicia of reliability.  Davidheiser has in fact alleged the who, what, where, when, and how of the fraud alleged in this Count:

a.   Who –Capital Rail;

b.   What – Defendant submitted claims for payment for concrete that it knew to be defective and failed to perform quality control testing on the same. Defendant's failure to provide acceptable concrete and concrete which adheres to specification in the Contract has already caused significant damage to the Dulles Project and is expected to negatively impact the project's completion schedule, thus leading to even further yet presently unquantifiable economic damages down the line.

c.   Where – UCP's factories in Stowe, Pennsylvania

d.   When – July 2015 through present.

e.   How – Defendant's precast concrete fails to meet the requirements specified in the contract with MWAA and fails to conform to industry standards. Capital Rail was either aware or, given the contract requirement that Capital Rail perform inspections of its subcontractors, should be aware of UCP's conduct.  When Defendant submitted a claim for payment for deficient concrete, its conduct violates the FCA.

125.   Defendant's contract requires that in order to bill for services, it must comply with all testing requirements.  By submitting claims for payment, Defendant is certifying that it is in compliance with all terms and conditions, including those relating to testing, of the contract

between it and MWAA.  By failing to properly test the concrete but certifying that it had done so, Defendant violated the FCA.

126.    The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and contracting protocols in an as of yet undetermined amount.

127.    Capital Rail agreed as an alternate remedy to pay for the sealant to be applied to the panels and has set up an escrow account to pay for the reapplication needed every ten years once the project is complete. The total cost and value of the alternate remediation will be between $5,000,000.00 and $18,000,000.00, and the United States and Commonwealth of Virginia are direct beneficiaries of this alternate remedy agreement entered into with Capital Rail.

128.    Davidheiser was the catalyst and but-for cause of Capital Rail's agreement to provide an alternate remedy and thus is entitled to a Relator's Share.

### Count II
### Violation of the False Claims Act,
### 31 U.S.C. § 3729(a)(1)(B)

129.    Davidheiser incorporates herein by reference and re-alleges the allegations stated in the foregoing paragraphs.

130.    The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

131.    Defendant knowingly made or caused to be made a false record or statement to a false claim when it created false testing data to support its claims for payment for deficient concrete.

132. The result of Defendant's actions has led the federal government to pay for deficient concrete.

133. The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and contracting protocols in an as of yet undetermined amount.

134. Capital Rail agreed as an alternate remedy to pay for the sealant to be applied to the panels and has set up an escrow account to pay for the reapplication needed every ten years once the project is complete. The total cost and value of the alternate remediation will be between $5,000,000.00 and $18,000,000.00, and the United States and Commonwealth of Virginia are direct beneficiaries of this alternate remedy agreement entered into with Capital Rail.

135. Davidheiser was the catalyst and but-for cause of Capital Rail's agreement to provide an alternate remedy and thus is entitled to a Relator's Share.

### Count III
### Violation of the Virginia Fraud Against Taxpayers Act,
### Va. Code Ann. § 8.01-216.3(A)(1)

136. Davidheiser incorporates herein by reference and re-alleges the allegations stated in the foregoing paragraphs.

137. Defendant knowingly presented or caused to be presented to the state of Virginia, false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval under procurement contracts in violation of Va. Code Ann. § 8.01-216.3(A)(1).

138. Defendant knowingly caused to be presented claims to obtain payment for deficient concrete to the state of Virginia.

22

139.   Defendant presented or caused to be presented fraudulent claims by billing for deficient concrete.

140.   Under its contract with MWAA, Capital Rail is required to inspect the work of its subcontractors, including UCP.

141.   Capital Rail never performed such inspections.

142.   Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Davidheiser need only allege sufficient indicia of reliability.  Davidheiser has in fact alleged the who, what, where, when, and how of the fraud alleged in this Count:

    f.   Who –Capital Rail

    g.   What – Defendant submitted claims for payment for concrete that it knew to be defective and non-compliant with the specifications in the Contract.  Further, Defendant failed to perform quality control testing on the same.  Defendant's failure to provide compliant concrete has already caused significant damage to the Dulles Project and is expected to negatively impact the project's completion schedule, thus leading to even further economic damages down the line.

    h.   Where – UCP's factories in Stowe, Pennsylvania

    i.   When – July 2015 through present.

    j.   How – Defendant's precast concrete fails to meet the requirements specified in the contract with MWAA and fails to conform to industry standards. Capital Rail is either aware or, given the contract requirement that Capital Rail perform inspections of its subcontractors, should be aware of UCP's conduct.  When

Defendant submits a claim for payment for deficient concrete, its conduct violates the Virginia Fraud Against Taxpayers Act.

143.   Defendant's contract requires that in order to bill for services, it must comply with all testing requirements. By submitting claims for payment, Defendant is certifying that it is in compliance with all terms and conditions, including those relating to testing, of the contract between them and MWAA. By failing to properly test the concrete but certifying that it had done so, Defendant violated the Virginia Fraud Against Taxpayers Act.

144.   The Commonwealth of Virginia has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and contracting protocols in an as of yet undetermined amount.

145.   Capital Rail agreed as an alternate remedy to pay for the sealant to be applied to the panels and has set up an escrow account to pay for the reapplication needed every ten years once the project is complete. The total cost and value of the alternate remediation will be between $5,000,000.00 and $18,000,000.00, and the United States and Commonwealth of Virginia are direct beneficiaries of this alternate remedy agreement entered into with Capital Rail.

146.   Davidheiser was the catalyst and but-for cause of Capital Rail's agreement to provide an alternate remedy and thus is entitled to a Relator's Share.

**Count IV**
**Violation of the Virginia Fraud Against Taxpayers Act,**
**§ 8.01-216.3(A)(2)**

147.   Davidheiser incorporates herein by reference and re-alleges the allegations stated in the foregoing paragraphs.

148.    The Virginia Fraud Against Taxpayers Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

149.    Defendant knowingly made or caused to be made a false record or statement to a false claim when it created and submitted false testing data to support its claims for payment for deficient concrete.

150.    The result of Defendant's actions has led the state of Virginia to pay for deficient concrete.

151.    The Commonwealth of Virginia has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and contracting protocols in an as of yet undetermined amount.

152.    Capital Rail agreed as an alternate remedy to pay for the sealant to be applied to the panels and has set up an escrow account to pay for the reapplication needed every ten years once the project is complete. The total cost and value of the alternate remediation will be between $5,000,000.00 and $18,000,000.00, and the United States and Commonwealth of Virginia are direct beneficiaries of this alternate remedy agreement entered into with Capital Rail.

153.    Davidheiser was the catalyst and but-for cause of Capital Rail's agreement to provide an alternate remedy and thus is entitled to a Relator's Share.

## **PRAYER FOR RELIEF**

WHEREFORE, Davidheiser prays, on behalf of the United States and himself that, on final trial of this case, judgment be entered in favor the United States and against Defendant Capital Rail as follows:

1. On the Causes of Action under the False Claims Act and the Virginia Fraud Against Taxpayers Act for the amount of the United States' and the state of Virginia's damages, multiplied as required by law, and for such civil penalties as are allowed by law.

2. For the costs or this action, prejudgment interest, interest on the judgment, a reasonable Relator's Share, and for any other and further relief to which the United States, the state of Virginia, and Davidheiser may be justly entitled.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relator demands a jury trial as to all issues so triable.

R. Scott Oswald
R. Scott Oswald, VSB #41770
Nicholas W. Woodfield, VSB #48938
Janel E. Quinn, VSB #89503
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2813
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
jquinn@employmentlawgroup.com
*Counsel for Relator*

26